**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward COOK, Defendant-**
**Appellant.**

**No. 74–1164.**

United States Court of Appeals,
Fifth Circuit.

Dec. 20, 1974.

Rehearing and Rehearing En Banc
Denied Feb. 13, 1975.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Meyer Rothwacks, Chief, Appellate Sec., John P. Burke, Murray S. Horwitz, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Edward Cook appeals from his jury conviction on five counts of willfully evading income taxes from 1966 through 1970 in violation of 26 U.S.C. § 7201. Through the diligent efforts of new counsel in this court, he advances six grounds for reversal, the last four of which, since not properly presented below, must constitute plain error to be reviewable here.[1] First, he contends that the government's evidence was insufficient to overcome his "cash hoard" defense. Second, he argues that the evidence failed to establish willful evasion. His third, fourth and fifth grounds assign, individually and cumulatively, three instances of prosecutorial conduct: unsupported attempts to impeach key defense witnesses during cross examination, closing argument use of a court-excluded statement by defendant, and closing argument statements that the defendant "was lying" and failed to testify. His final plain error contention relates to a lesser-included-offense instruction. We affirm.

Following the expenditures method, the government sought to show that Cook, who was unemployed, had an income of approximately 13,000 dollars from nontaxable sources for the five years; had not filed returns for any of the years; yet, had spent approximately 150,000 dollars. See United States v. Penosi, 452 F.2d 217, 220 (5th Cir. 1971). Neither Cook's defense below nor the present appeal focuses on these matters. Rather his defense was that prior to January 1, 1966, he had accu-

---

1. Fed.R.Crim.P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." See C. Wright, Federal Practice and Procedure, § 856.

mulated cash and other assets of a value in excess of 150,000 dollars, which were the source of the funds spent. *See, e. g.*, United States v. Newman, 468 F.2d 791, 794 (5th Cir. 1972).

To address the sufficiency question, we must record the evidence presented at trial in some detail. The Government's proof established that Cook had not filed income tax returns for any of the years in question and that treasury agents had made an exhaustive search which failed to discover any assets held by defendant prior to January 1, 1966, other than two cars valued at 5,850 dollars. This conclusion was supported by evidence that Cook had been infrequently employed prior to 1966 and that, during the prosecution years, he had "financed" several purchases. It was stipulated that the defendant was totally unemployed and earned no income whatsoever from 1944–1948, 1951–1960 and 1964–1965, and that he received no gifts or bequests nor inheritance from his mother at her death in 1967. His former wife, Geraldine, whom he married in February, 1961; separated from in 1962; reunited with in 1965 and divorced in May 1966, testified, *inter alia*, that defendant did not have a job in 1961 when they were married and that she did not know if or when he got his first job after that. She had to work as a secretary for a short time during the marriage. She had no knowledge that defendant had a safety deposit box, or any jewelry, or a coin collection. In addition, she testified that not only had they borrowed money from the family when they were short of cash, but they had also financed the purchase of a 1965 Oldsmobile. F.B.I. Special Agent Guilfoile testified that he had known Cook's current wife, Joan, even before 1966, but had never known her to be gainfully employed. By Cook's own statement, his employment record prior to 1951 had been sporadic and insubstantial. In fact, his only sustained employment was from 1962–1964 when he received a salary of 250 dollars per week as an employee of a jewelry company. Also tending to negate the existence of pre-1966 assets was the evidence that Cook had to obtain credit for several purchases during the prosecution years. In 1967 he purchased a 59,500 dollar house and assumed both a first and second mortgage. He also financed part of the purchase price of a 12,566 dollar Donzi Boat and a new Oldsmobile automobile.

Other evidence established abundant facts about Cook's financial activities and resources and numerous inconsistencies in his personal representations about them. In August, 1969, for example, defendant told F. M. Beirne, a local police officer, that he was still under investigation by the Internal Revenue Service because of not filing an income tax return. Beirne further quoted Cook as saying his standard explanation for this was that his wife was wealthy and that since he had never held a job or earned 600 dollars annually, he was not required to file an income tax return.[2] This statement is in direct conflict with Cook's credit card and loan applications during the prosecution years in which he consistently represented himself to have an income of 18,000 or 20,000 dollars per year. The source of his income was variously shown as deriving from self-employed, semi-retired, or retired activity in stocks, bonds and investments, or the cosmetic business. Evidence of other business activity by the defendant during the prosecution years included Cook's ordering of locksmith's tools under the trade name Cook's Key and Hobby Shop and his representation in 1967 that he was in the perfume business or had something to do with a donut establishment.

2. An agent of the Internal Revenue Service testified that Cook made essentially the same statement to him. Subsequent to the admission of this evidence, the Court ruled that the failure to give Coow administratively required warnings, Int.Rev.Manual § 9384.2, rendered this testimony excludable. The record reveals that at this point counsel for Cook made the deliberate strategic choice to leave this testimony in the record rather tham having it highlighted by a specific direction from the Judge that the jury should disregard it.

Cook made substantial outlays of cash in the covered period. Included were the purchase of five cars, for which he paid out cash ranging in an amount from 2065 to 3700 dollars; a 6200 dollar initial payment on the Donzi Boat, and an 18,000 dollar cash payment for a lot. In at least two of the prosecution years, Cook's total cash payments (28,601.65 and 22,261.21 dollars) were more than double the payments for purchases he made by check.

Defendant's proof included no documentation of his pre-1966 ownership of assets. He did, however, produce three witnesses to support his claim that substantial asset ownership accounted for his spendings in the tax period. They were Howard Brodsky, a bondsman; Ronald Hanson, a business friend; and Richard Chapman, a self-employed dealer in jewels. Brodsky's contact with Cook was as a bail bondsman on an unrelated criminal charge. In his testimony to the jury the relationship was merely described as one requiring Cook to place collateral with Brodsky. Brodsky testified that in 1963 and 1964 Cook had safety deposit boxes containing a gold coin collection, diamonds (including a canary diamond appraised for more than 75,000 dollars), cash, and other assets which in total value exceeded 150,000 dollars. He further stated that he took possession of these items and in 1966 and 1967 redelivered their contents to Cook. Hanson testified he had known Cook in Chicago, that in December of 1965 he had borrowed 35,000 dollars in cash from Cook to establish a wig business, and that in about February or March of 1966, when the projected venture did not materialize, he returned these funds.

Cook also presented testimony from Richard Chapman to the effect that Chapman shared offices and a telephone with one Herman Gordon, who was a wholesale diamond merchant. Chapman testified that in the summer of 1968 he witnessed a transaction in which Gordon paid Cook 85,000 dollars in cash for a large canary diamond. Inferentially, this diamond was similar to a diamond Brodsky testified he observed to be in Cook's safety deposit box in 1963.

■ It is essential to affirmance to find that the jury was furnished adequate proof of the defendant's net worth at the opening of the tax period in question. United States v. Penosi, *supra*; Marcus v. United States, 422 F.2d 752, 755 (5th Cir. 1970). In this case, the inferences to be drawn from the evidence of little or no income prior to 1966 and credit purchases after January 1, 1966 together with the special agent's testimony that Cook's net worth on January 1, 1966, the beginning of the prosecution years, was less than 6,000 dollars were opposed by the testimony of Brodsky, Hanson and Chapman. The fact that a conflict existed, however, is immaterial, because viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680 (1942), the record contained substantial evidence from which the jury could conclude beyond a reasonable doubt that the agent's testimony was accurate.

Similarly a reasonably minded jury could validly draw inferences from the government's circumstantial evidence of credit purchases accompanied by large and extensive dealings in cash, and inconsistent statements as to the sources of his finances that, beyond a reasonable doubt, Cook was living on taxable income received in the subject period upon which he willfully evaded taxation rather than on a cash hoard accumulated previously. United States v. Nazien, 504 F.2d 394 (5th Cir. 1974); United States v. Warner, 441 F.2d 821, 830 (5th Cir. 1971); United States v. McGlamory, 441 F.2d 130, 135 (5th Cir. 1971). These permissible inferences would be sufficient to establish affirmative evasion. Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943). *See also* United States v. Newman, 468 F.2d 791, 794 (5th Cir. 1972).

■■ Cook's remaining assignments of error are raised for the first time in this court. They were not even brought

before the trial court in his post trial motions. To permit review, the plain error threshold must be crossed. *See, e. g.,* United States v. Smith, 502 F.2d 512, 519 (5th Cir. 1974). Acknowledging this to be the standard, Cook urges it was plain error for the prosecution to imply, in its cross examination of defense witnesses Howard Brodsky and Richard Chapman, that it possessed impeaching information without thereafter offering supporting evidence when the questions were answered adversely.[3] *Cf.* United States v. Constant, 501 F.2d 1284 (5th Cir. 1974). Since failure to introduce rebuttal on these points is more likely to have aided than harmed defendant, and since his counsel capitalized on the lack of such rebuttal in closing arguments, we refuse to try the issue for the first time in this court under the plain error rule.

■ Cook's criticisms of the closing arguments urge that the prosecutor impermissibly utilized a statement which had been made by Cook to an IRS agent, but which had been ruled inadmissible by the court. Assuming this was error at all, the problem for treating it as plain error is that the very same statement had been admitted in evidence through Officer Beirne.[4] If objection had been timely made and the court's ruling had been made retroactively applicable to the IRS agent's testimony, the problem could have been clarified without prejudice. This is precisely the kind of matter that cannot qualify as plain error.

■ Cook further contends that the court committed plain error when it allowed the prosecutor to argue:

"Today I want to tell you, this case is not difficult to decide. It is an extremely large amount of evidence coming in here which shows that the defendant, No. 1 spent the money, made many admissions as to taxable income. *Only to the Internal Revenue Service and to you does he need hide because he has a technical income, because he had a cash hoard.* It is evidence on the record that such a cash hoard did not exist. *He was lying* and purposely and willfully evading the income tax." (Emphasis is added)

The government asserts that the "hide" allusion in this statement was intended to point out the contrast between Cook's admissions on loans and credit applications of income around 20,000 dollars a year and his later assertion that he didn't earn 600 dollars a year. They also urge that the comment was meant to question the existence of defendant's asserted cash hoard. The use of the phrase "he was lying", while confessedly ill advised and inappropriate, is said to have been based on a permissible belief inferred from the evidence. *See, e. g.,* United States v. Greenberg, 268 F.2d 120, 123–124 (2nd Cir. 1959).

In the abstract, the argument is clearly objectionable.

. . . [P]rosecutors should exercise utmost restraint and caution in fashioning arguments which may tend to support the suggestion of a comment on the failure of a defendant to testi-

---

3. The witness Brodsky answered these questions in the negative:

"Q. Isn't it a fact, sir, you told them (F. B.I. Agents) those coins were submitted to you by Martin Katz and were owned by Martin Katz?

\* \* \* \* \*

Q. Isn't it a fact you also later told them you returned the gold coins not to Clarence, but John Cook?

Q. Isn't it a fact you told the F.B.I. agent it was returned to Clarence Cook?

\* \* \* \* \*

Q. Didn't you tell the F.B.I. that the 27 carat diamond was owned by Martin Katz?

The questions to and answers by the witness Chapman were:

Q. Are you telling me as an expert in the diamond business that all diamond merchants deal exclusively in cash?

A. I didn't say . . . exclusively . . . I say primarily.

\* \* \* \* \*

Q. But you are not prepared to state whether this is the custom throughout the diamond trade?

A. I would say that it is . . . on a wholesale level between diamond brokers.

4. See note 2, *supra,* and accompanying text.

fy. Additionally, expressions of personal opinion as to the credibility of witnesses for the prosecution should be avoided. "It is as much his [the prosecutor] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one".

United States v. Rhoden, 453 F.2d 598, 600 (5th Cir. 1972) *quoting* Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314, 1321 (1935).

However, to establish the "hide" comment as an allusion to the defendant's refusal to testify requires an inference which is altogether too tenuous to support plain error reversal. We note that the opening words of this sentence couple the revenue service with the trial court jury in speaking of those from whom Cook need "hide". Since the revenue service performs an extrajudicial function of investigation, its mention tends to disassociate the tenor of the remarks from the hiding of courtroom testimony. It is entirely plausible to construe the thought intended to be conveyed as a *challenge to the jury* to use Cook's own prior representations that he had income as a basis for rejecting the defense assertion that his large spendings came from a prior accumulation and that he had no income over 600 dollars for any of the years. This is what the trial was mainly about. The failure of defense counsel to object helps to confirm that the argument was sufficiently ambiguous to deny it classification as an error which plainly deprived defendant of any substantial right.

Whatever prejudicial effect might have obtained from the "lying" comment, was diminished both by an express disclaimer by the prosecution and by defense counsel's use of the prosecutor's argumentary indiscretions in an attempt to turn the "lying" remark against the prosecution.[5] At the beginning of this closing argument, the prosecutor stated:

I want my discussion to be based on the evidence you have heard in this courtroom. As I said at the outset, what lawyers say is not evidence, no matter how important we think it is, it is not evidence and it is not properly considered by you in arriving at the verdict. *It is to aid you.* If your recollection of the evidence differs from what I said, follow your recollection. You are the people who are to evaluate the evidence.

While the comment was altogether improper and an objection would surely have brought corrective action, we must weigh the degree to which the prosecutor's argument may have affected a substantial right belonging to the defendant. We conclude that the prejudicial effect was slight, while the evidence of guilt was substantial. *See* United States v. Rodriques, 503 F.2d 1370 (5th Cir. 1974); United States v. Rhoden, 453 F.2d 598 (5th Cir. 1972). "Without putting our imprimature on every remark made by the prosecutor, we perceive no plain error which should be noticed in the absence of objection. . . ." United States v. Jenkins, 442 F.2d 429, 435 (5th Cir. 1971); United States v. Scaglione, 446 F.2d 182, 188 (5th Cir. 1971).

■ Finally, appellant argues that misdemeanors under Section 7203 (failure to file) are not lesser included

5. Defense counsel argued that it constituted "unfair tactics" to "try to create prejudice in the minds of the jury by inflection, innuendos, insinuations" and that the prosecution was attempting to "inflame people" by "twist[ing] the truth". Then he came to the point:

Now, I resent it. I personally resent it calling my client a liar.

Now he is an American citizen and he is entitled to every kind of a courtesy; every kind of a right and privilege that you or I should be entitled to in this Court of Law. Why is he a liar? Because he tried to prove in a particular time, in 1963, he had a valuable diamond and he had a gold coin collection. And you call him a liar? Well, let us see. Now, who is lying here?

I don't call anybody a liar, but I say who is making the mistake? Who is making the false innuendo?

crimes under Section 7201 (willful evasion) and, thus, that the giving of a lesser-included-crime instruction was erroneous. The failure to bring the error complained of here to the attention of the trial court would bar its assignment as error under Fed.R.Crim.P. 30, unless it fell under Rule 52(b). But the instruction here involved was not error at all. The misdemeanor provisions of Section 7203 involve a willful *omission* of failing to file a return. The felony provisions of Section 7201 includes the broader offense of willful *commission* of an attempt to evade or defeat the tax. Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943). *See*, United States v. Bishop, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). *Cf*. United States v. Bowness, 504 F.2d 391 (5th Cir. 1974).

We have carefully considered appellant's auxiliary arguments and find them equally without merit.

Affirmed.