UNITED STATES of America, Plaintiff-Appellee,

v.

Edward Chambless FOGG, III, Defendant-Appellant.

No. 80–5900.

United States Court of Appeals, Fifth Circuit. Unit B

Aug. 6, 1981.

Rehearing and Rehearing En Banc Denied Oct. 8, 1981.

C. Harris Dittmar, Jacksonville, Fla., for defendant-appellant.

Atlee W. Wampler, III, U. S. Atty., Kevin M. Moore, Stephen B. Gillman, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before HILL and VANCE, Circuit Judges, and LYNNE,* District Judge.

LYNNE, District Judge:

This appeal concerns the amazing attempt of appellant, the corporate president of a thriving food store chain, to skim approximately $80,000 per year off the wholesale price that his company paid for orange juice and pour it, tax-free, into his own pocket. On March 30, 1980, a grand jury, sitting in the Southern District of Florida, indicted appellant on ten counts of income tax evasion. Appellant's jury trial began on June 11, 1980. At the close of the government's case, the trial judge granted appellant's motion for judgment of acquittal on those counts charging that appellant had assisted in presenting fraudulent corporate tax returns for the years 1973–77.[1] The jury convicted appellant of personal income tax evasion in violation of 26 U.S.C. § 7201[2] for the years 1973–77. On November 6, 1980, the district judge fined appellant $50,000 and sentenced him to prison for a total of thirty months.

Reduced to its simplest terms, the government's case against appellant consisted of evidence that he received "kick-

---

* Hon. Seybourn H. Lynne, Senior District Judge of the Northern District of Alabama, sitting by designation.

1. The government alleged violations of 26 U.S.C. § 7206(2).

2. Section 7201 reads in pertinent part:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

backs" from the Florida Orange Juice Company (FOJC) which supplied his food store chain with orange juice. Appellant did not report these "kickbacks" as personal or corporate income. The controller for FOJC, Aron Kelton, testified that he drew disbursement checks to Farm Stores (appellant's business) on a regular basis.[3] The amount of each check equalled the number of units of orange juice sold to Farm Stores since the last check, times an allowance or reimbursement figure.[4] Kelton personally delivered checks to Farm Stores' offices on two occasions when Frank Knight, the regular courier and the general manager of FOJC, was out of town. The checks were enclosed in envelopes marked "Farm Stores, attention Mr. Ed Fogg." Kelton further testified that the reimbursements sent to Farm Stores were labeled as "promotion" on FOJC's books. FOJC did not have this sort of arrangement with any of its other customers.

Frank Knight worked for FOJC from approximately 1951 until 1977. He explained the reimbursements as the result of appellant's apparent desire "to have more money to spend." Appellant asked Knight in the early 1970's if he could pay extra for orange juice and receive a refund from FOJC at the end of each month. Knight agreed. Knight always delivered the checks to appellant by hand. At appellant's request, each check was made payable to Farm Stores Processing, a division of Farm Stores.

John Rife, an accountant with Farm Stores, also testified for the government. Rife was specifically employed by Dairy Management Service, a partnership consisting of appellant and his brother. Rife testified that appellant gave him the first FOJC check, told him to give him cash for it, and

stated that he planned "to use the money for legitimate business purposes." Thereafter, as he received FOJC checks from appellant, Rife deposited them to a bank account entitled Farm Stores, Inc., Milk Processing Division. He testified that he sometimes handled the checks through an exchange or general ledger account by debiting the bank account and crediting the exchange account or petty cash. He would then have a check written to cash, disguising the entire transaction by making the opposite entries in each account. One of Rife's assistants cashed each check. Rife personally transferred the cash to appellant and kept only informal notes on the receipt of each check. He never recorded the amounts as business income to Farm Stores, admitting on the stand that he "used poor judgment in handling it that way."[5]

The government presented several other witnesses including the agent who had conducted the audit of Farm Stores' 1975 and 1976 tax returns. In the course of that audit, the agent received documents indicating that appellant, because of his education and experience, was an expert accountant. Appellant's defense consisted of testimony by numerous character witnesses.[6] He did not testify in his own behalf.

Appellant contends that the government failed to construct a prima facie case of personal income tax evasion because it did not prove what Fogg did with the money after he received it from Rife. In his testimony, Rife stated that Fogg told him the money was to be used for "legitimate business expenses." The government's failure to contradict this hearsay statement, so the argument runs, indicates that the jury based its verdict of guilty on mere conjecture. The government argues that it presented substantial evidence of appel-

---

**3.** Frank Knight, the general manager of FOJC testified that he paid the "refunds" three times a month instead of once so that FOJC's bank account would not be hit with a huge expenditure at one time.

**4.** The reimbursement figure varied from 1¢ to 2.5¢ per unit.

**5.** Mildred Elkins, Rife's assistant, testified that she handled the FOJC checks in the manner described above when Rife was out of town. She cashed the checks and either gave the money to appellant or placed it in the cash box.

**6.** These included the Mayor of Dade County, Florida, the President of the University of Miami, and the retired Bishop of the Episcopal Diocese of Southern Florida.

lant's guilt, more than meeting its burden under 26 U.S.C. § 7201 and the pertinent case law. We agree with the government and affirm the lower court's refusal to grant appellant's motion for judgment of acquittal.

■ In *United States v. Hiett*, 581 F.2d 1199, 1200 (5th Cir. 1978), we cataloged and commented upon the elements of a Section 7201 violation:

> To establish a § 7201 violation, the government must prove (1) the existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax due, and (2) willfulness.... To establish a tax deficiency, the government must show first that the taxpayer had unreported income, and second, that the income was taxable. (Citations omitted).

As did the appellant in *Hiett*, Mr. Fogg contends that the money he undisputably received from FOJC was not taxable income. *Hiett* maintained that the government failed to prove the existence of a taxable source [7] or the nonexistence of any nontaxable source [8] for his unreported income. In allowing the government to present testimony of an Internal Revenue agent that his extensive investigations revealed no possible nontaxable source for Hiett's extra income,[9] we noted that Section 7201 does not require the government "to prove a cosmic negative." *Id.* at 1201. To require the government in the instant case to disprove Fogg's accountant's meager recollection of Fogg's purported use of the money would be absurd. The government met its burden under the statute by demonstrating Fogg's receipt of unreported income and the existence of its taxable source.

*Hiett* also examines another issue raised by Fogg relating to the government's burden of proof. In *Hiett*, we affirmed the

lower court's placement of the burden of proof on the defense to show that Hiett's expenditures were for business, not personal, purposes. *Id.* at 1202. It stated clearly that the burden of proving deductions is on the defendant. If Fogg contends that he used the money from FOJC for legitimate business expenses, he must prove it. He chose to remain silent at trial and allow the jury to draw inferences from the evidence without the benefit of his version of the facts.

Appellant goes to great lengths in his brief to distinguish the cases of *United States v. Lawhon*, 499 F.2d 352 (5th Cir. 1974), and *McClanahan v. United States*, 292 F.2d 630 (5th Cir. 1961). These cases are similar to *Hiett* because in each we refused to place the burden of proving the legitimacy of deductions upon the government. Fogg claims that his situation differs from that of *Lawhon* because he does not assert his right to off-setting deductions; rather, he refused to characterize the money he received as income. The government's point in this regard is well taken. It contends that there is no real distinction between the basic arguments of Fogg and Lawhon. Neither appellant denied receiving money. Each offered a reason why he should not pay taxes on the funds. When the government in the instant case presented evidence indicating that the money received by Fogg was income to him, the court below properly submitted that question to the jury.

Internal Revenue Agent Tepper testified for the government as an expert IRS auditor and accountant. The prosecutor asked Agent Tepper to give his opinion of the tax treatment of the transactions in evidence. Agent Tepper stated that the payments to Fogg would be characterized as constructive dividends from the Farm Stores Corporation.[10] Without documentation, the In-

---

7. *See Holland v. United States*, 348 U.S. 121, 138, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954).

8. *See United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958).

9. *See United States v. Dwoskin*, 644 F.2d 418 (5th Cir. 1981).

10. Q. [By Mr. Moore] Mr. Tepper, with respect to the checks to cash that were cashed and the proceeds given to the defendant in the same approximate amount of the Florida

ternal Revenue Code would not recognize expenditures as business expense deductions. Appellant emphasizes the impropriety of Agent Tepper's testimony because it was prejudicial and because it stated legal conclusions.

In *United States v. Bass*, 425 F.2d 161 (7th Cir. 1970), the court remanded the case for several reasons, the least of which was the government's attempt to prove the existence of income through the testimony of an Internal Revenue agent. The agent stated that certain corporate expenses of the appellant's corporation were improper and would be charged as income to appellant. *Bass* is easily distinguishable from the instant case because the government did not rely solely on Agent Tepper's testimony or upon lack of documentation to establish receipt of income by Fogg. Fogg's counsel cross-examined Rife and elicited the statement that Fogg told him the money was for business purposes. The government took the opportunity to rebut this exculpatory evidence with the agent's testimony.

Moreover, the court below, in denying appellant's motion for a new trial, made

> Juice checks that were put in and deposited to the Milk Processing account under generally accepted accounting principles, how would these amounts be reported on the taxpayer's individual return?
> * * * [Objection]
> THE COURT: The agent heard the testimony concerning this. If you can answer that question, I will let you go ahead.
> THE WITNESS: Without any other evidence these monies would be considered constructive dividend [sic] to the taxpayer.
> Q. [By Mr. Moore] And as a constructive dividend how would they be reported?
> A. As dividend income.
> Q. In your examination of the returns of the taxpayer Fogg, did you ever determine the amount of checks to petty cash [that] were reported as constructive dividend [sic] on the return of the defendant?
> A. These monies weren't reported on the return of the defendant.
> Q. Mr. Tepper, assume the monies paid to the corporate officer were used for legitimate business expenses, how would they be treated on the books and records of the corporation?
> A. That would depend on whose business expenses they are for.

several observations about *Bass*. First, the testimony of the agent was only a superfluous reason for remand. The court remanded the case mainly because of erroneous jury instructions. Second, we had not accepted *Bass's* teachings concerning expert testimony. Third, as of October 10, 1980, no court in any jurisdiction had cited *Bass* for the proposition urged by Fogg.

■ In contrast to *Bass*, it is well settled that " 'such expert testimony [that of an agent] is permissible in a tax evasion case, provided . . . that the expert testifies on the basis of facts in evidence.' " *United States v. Schafer*, 580 F.2d 774, 778 (5th Cir. 1978), *quoting, United States v. Johnson*, 319 U.S. 503, 519–20, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546 (1943).[11]

■ Fogg also objects to Agent Tepper's testimony because in it he stated legal conclusions. Fogg specifically objects to the following statement: "Without any other evidence those monies [from FOJC] would be considered constructive dividend [sic] to the taxpayer." It appears to this Court that Agent Tepper merely stated his opinion as an accountant, and did not attempt

> Q. Assume further that they were for in this case the Farm Stores Corporation, how would they be treated?
> A. Either as a deductible or nondeductible business expense.
> Q. And if they were ·for a deductible business expense, how would they be treated?
> A. They would have been charged to whatever expense it was for.
> Transcript at 457–59.
>
> * * * * * *
>
> Q. Mr. Tepper, finally based on the testimony that you have heard and the books and records that you have examined, were you able to make a determination of whether these amounts that were being claimed as legitimate business expenses whether they were in fact reported as legitimate business expenses? .
> A. They weren't reported as legitimate business expenses.
> Transcript at 462–63.

11. *See United States v. Grote*, 632 F.2d 387, 390 (5th Cir. 1980); *United States v. Milton*, 555 F.2d 1198, 1203–04 (5th Cir. 1977).

to assume the role of the court. Since the court below instructed the jury about the weight to be afforded expert testimony, Agent Tepper's statements were placed in the proper perspective. In *United States v. Milton*, 555 F.2d 1198, 1204 (5th Cir. 1977), a prosecution for conducting an illegal gambling business, we affirmed the lower court's admission of expert testimony although it appeared to be a legal conclusion. In reaching the decision to affirm, we considered the testimony in its context, the complexity of the case, and the correctness of the witness' statement. We also emphasized "the trial court's admonitions to the jury to accord no unusual deference to expert testimony and to take the court's instructions as the sole source of applicable law . . . ." *Id.*

When one compares Agent Tepper's testimony with that of the customs agent in *Huff v. United States*, 273 F.2d 56 (5th Cir. 1959), the correctness of the trial court's decision is apparent. The district court in *Huff* allowed the customs agent to state his interpretation of the customs laws, and apply it to the ultimate issue in the case. *Id.* at 61. We predicated our decision to reverse on numerous grounds other than the admission of prejudicial expert testimony. Moreover, *Huff* was decided before the liberalization of the Federal Rules of Evidence. Rule 704 now allows experts to state their opinions on the ultimate issue. Most important in comparing *Huff* with the instant case is the fact that Agent Tepper never couched his testimony as judicial instructions to the jury. He simply stated his opinion as an accountant. In this day and age, any accountant who lacks adequate knowledge of the tax laws is risking liability for malpractice.

■ Comments by a prosecutor upon the failure of a criminal defendant to testify in his own defense violate the defendant's fifth amendment rights and necessitate reversal.[12] We recently clarified this general rule in *United States v. Bright*, 630 F.2d 804 (5th Cir. 1980):

To reverse for improper comment by the prosecutor, we must find one of two things: that "the prosecutor's manifest intention was to comment upon the accused's failure to testify" or that the remark was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."

*Id.* at 825, *quoting, United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977) (citations omitted).

The court, however, drew a distinction between a comment concerning "the failure of the *defense,* as opposed to the *defendant,* to counter or explain the evidence." 630 F.2d at 825 (citations omitted). A comment about the former did not violate the defendant's fifth amendment rights.

■ In his closing argument, appellant's counsel pleaded with the jury as follows:

Now, my job is almost done. I have a very important job, too. I am in this courtroom to defend a man who has lived over sixty years as an outstanding man in his community, whose whole life is in jeopardy by reason of this criminal charge. I feel the awesome burden that I have. Suppose I don't do something that I should do and this innocent man is convicted. That's why throughout I have tried to the best of my ability, with the assistance of my partner, to do everything I could do to make sure that only fair, straightforward evidence got to you.

In rebuttal to this appeal for sympathy, the prosecutor stated:

Now, he says that somebody has put this man's life in jeopardy. A criminal case, Ladies and Gentlemen, this case is here for one reason and one reason only. It was this defendant who committed the acts that are uncontroverted. They have not been controverted by anything that Mr. Dittmar has brought out in his closing argument. It was the defendant that

---

12. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Chandler*, 586 F.2d 593, 603 (5th Cir. 1978);

*United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir. 1978).

put himself into question, put his own liberty in jeopardy because there is no legitimate explanation. You didn't hear one legitimate explanation for that type of conduct.

It appears to this Court that the prosecutor merely commented upon the complete failure of the defense to rebut the government's case. Indeed, the trial court wrote in its order denying Fogg a new trial: "[T]he comments in question here neither show the required manifest intent, nor would they naturally and necessarily be taken to be a comment on the defendant's failure to take the stand." It is also obvious that appellant was not the only person who could have controverted the government's case against him.

■ As a final assault, appellant collects under the topic "Prosecutorial Misconduct" a myriad of offenses allegedly perpetrated against him. First, he complains that the prosecutor deprived him of the "shield of the grand jury" by failing to present live witnesses. The prosecutor read portions of the transcripts of the testimony of witnesses before other grand juries [13] to the grand jury returning the original and the superseding indictments.[14] This is a bogus contention since the district court allowed the disclosure of the testimony taken before the other grand juries. This procedure was approved by this Court in United States v. Malatesta, 583 F.2d 748, 752–54 (5th Cir. 1978), aff'd on other grounds en banc, 590 F.2d 1379 (5th Cir. 1979). In his reply brief, appellant claims that the grand jury did not hear portions of Rife's testimony that might have altered the indictment returned against him. The government claims that it read "verbatim and without summary" the testimony of those witnesses "essential to the establishment of probable cause." After a thorough review of the record, we agree with the government. It would have served no purpose for the government to read testimony about appellant's alleged participation in a wiretapping operation to the grand juries investigating his alleged tax evasion.[15]

■ Appellant also claims that the prosecution sought a superseding indictment on the counts alleging violation of 26 U.S.C. § 7606(2) even though it knew it lacked sufficient evidence to support these counts. The prosecution allegedly used these counts as a vehicle to present irrelevant and prejudicial evidence to the jury. This argument fails because, as the court below noted in its order denying appellant's motion for a new trial, the evidence of the kickback scheme was not only relevant but crucial to the charges of personal income tax evasion.

■ Appellant next claims that the government violated the teachings of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In Brady, the Supreme Court reversed a state criminal conviction because the prosecution had withheld evidence which was favorable and material to the defense. Appellant in the instant case emphasizes the lower court's order that all Brady material be delivered to appellant by March 6, 1980. The government failed to supply some material until the day of trial. Brady only requires that the defense receive the materials prior to trial. Appellant specifically claims that he did not know of

13. Farm Stores was previously investigated for wiretapping the telephone conversations of its employees. The results of these investigations were presented to grand juries. The prosecution read the testimony of certain witnesses at the wiretap hearings to the grand juries that indicted Fogg for tax evasion.

14. The trial court dismissed the counts of the original indictment alleging that Fogg aided in the preparation of fraudulent corporate tax returns for lack of specificity. The prosecution, not wishing to try Fogg on only the counts charging preparation of fraudulent personal tax returns, obtained a superseding indictment from another grand jury.

15. See United States v. Ciambrone, 601 F.2d 616, 623 (2d Cir. 1979) (prosecutor may exercise some discretion in choosing evidence to bring before grand jury as long as he does not mislead it); United States v. Eucker, 532 F.2d 249, 256 (2d Cir. 1976) (government not compelled to present all available witnesses to grand jury). See also United States v. Cruz, 478 F.2d 408, 412 (5th Cir. 1973) (appellate courts may not review sufficiency of evidence supporting indictment).

certain statements made before the grand jury by Knight and Rife. As noted by the government and by this Court in *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980):

> Regardless of whether the request was specific or general, and regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim.... In no way can information known and available to the defendant be said to have been suppressed by the Government. [Footnotes omitted].

Given appellant's close relationship with both Rife and Knight, his counsel could easily have obtained their statements.

 *Appellant objects to the prosecutor's use of the term "kickback scheme"* to characterize appellant's transactions with FOJC. The prosecutor employed this term in his closing argument only.[16] At a time when the jury was absent from the courtroom, he asked the trial court's permission to use the term. In view of this Court's definition of "kickback" in *United States v. Porter*, 591 F.2d 1048 (5th Cir. 1979),[17] the use of the term in this context seems particularly apt.

 Finally, appellant labels as prosecutorial misconduct certain comments made by the government in its sentencing memorandum and at Fogg's sentencing hearing. In the memorandum, the prosecutor stated that "for almost five years every person in this community who bought juice from the defendant's company was systematically overcharged." The government claims that this was merely a reasonable and permissible inference from the evidence. Appellant also objects to the mention of the wiretap investigation of Farm Stores as an attempt to link Fogg with that illegal activity. The government never mentioned the wiretapping until appellant brought it out during the cross-examination of Rife in an effort to show that he was harassed. The government claims that mentioning the wiretapping was relevant because at the time the wiretap investigation began, the kickback scheme stopped. Even if these statements were improper, the prosecutor made them to the judge and not to the jury. After listening to what the court below termed "the overwhelming evidence" of guilt in Fogg's case, it is doubtful that the prosecutor's written and spoken remarks at sentencing made any difference in the severity of the sentence imposed.

AFFIRMED.

---

16. Appellant also objected to the prosecutor's calling of a juror by name during the closing argument. Because the judge quickly gave a curative instruction, this is not grounds for reversal.

17. "In ordinary parlance, a kickback is the secret return to an *earlier possessor* of part of a sum received." 591 F.2d at 1054.